IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, and COMMONWEALTH OF KENTUCKY, | ) ) ) | |
| Plaintiffs | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO.: |
| AK STEEL CORPORATION, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs, the United States of America, by and through its attorneys, by authority of the Attorney General of the United States and acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), and the Commonwealth of Kentucky, ("Plaintiffs") allege the following:

## NATURE OF ACTION

1.      This is a civil action brought against AK Steel Corporation ("Defendant" or "AK Steel") for injunctive relief and the assessment of civil penalties for violations of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7401 *et seq.*, implementing regulations, AK Steel's title V permit, and the Kentucky State Implementation Plan ("SIP"). The alleged violations occurred at AK Steel's coke production facilities located at 400 East Winchester Avenue in Ashland, Kentucky (hereafter "AK Steel's Coke Plant" or "Plant").

## AK STEEL'S ASHLAND COKE OPERATIONS

2.      AK Steel's Coke Plant is in the vicinity of low income and minority residents, and

is within a mile of a retirement home for the elderly.   The Plant included two coke oven batteries.   Battery #3 was a four meter tall battery with 76 coke ovens and a single coke oven gas collection main.   Battery #4 was a five meter tall battery with 70 coke ovens and a double coke oven gas collection main.   Coke at the Plant was produced from coal.   Coal was charged into each coke oven through three ports in the top of each oven.   Once the charge was complete, the oven ports were sealed and the coal was heated using cleaned coke oven gas to approximately 2,100 degrees Fahrenheit for about 18 to 24 hours.   Volatile compounds were driven from the coal and sent to the by-products recovery section of the Plant.   At the end of the heating cycle for each oven, the front and rear doors were removed and the coke was pushed into a rail quench car. The quench car took the coke to the quench tower where the hot coke was cooled with water. The coke was then screened and sent off site.   Coke is used as a carbon source and as a fuel to heat and melt iron ore at steel making facilities.

     3.     Coke oven gases are specifically listed by Congress in Section 112 of the CAA, 42 U.S.C. § 7412, as a hazardous air pollutant, and contain Group A carcinogens (known to cause cancer in humans).

     4.     Section 112 of the CAA identifies only two industries specifically for regulation, coke oven manufacturing plants in Section 112(d)(8), and nuclear facilities in Section 112(d)(9).

## JURISDICTION AND VENUE

     5.     This Court has jurisdiction over the subject matter of this action pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, 1355 and 1391.

6.      Venue is proper in this district pursuant to CAA Section 113(b), 42 U.S.C.

§ 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a) because the violations of the Act giving rise to

this claim occurred in this district and the Defendant does business and is found in this district.

## NOTICES

7.      Pursuant to CAA Section 113(a), 42 U.S.C. § 7413(a), U.S. EPA notified AK

Steel and the Commonwealth of Kentucky of the violations of the Kentucky SIP alleged in this

Complaint more than 30 days prior to its filing.

## AUTHORITY

8.      Authority to bring this action is vested in the Attorney General of the United

States pursuant to 28 U.S.C. §§ 516 and 519 and 42 U.S.C. § 7605.

## DEFENDANT

9.      Defendant AK Steel Corporation is a corporation organized under the laws of the

States of Delaware and registered to do business in the Commonwealth of Kentucky.

Construction of the Ashland coke plant began in 1912, and it was doubled in size prior to its

completion in 1917.  AK Steel's predecessor,  Armco Inc. acquired the Ashland coke plant in

1994.  AK Steel operated the coke plant in Ashland, Boyd County, Kentucky until July 2011.

10.     AK Steel is a "person" as defined in CAA Section 302(e), 42 U.S.C. § 7602(e).

## DEFENDANT'S FACILITIES

11.     Defendant owned and/or operated a by-product coke plant consisting, in part, of

two coke oven batteries.  Battery #3 is a four meter tall battery with 76 coke ovens and a single

coke oven gas collection main.  Battery #4 is a five meter tall battery with 70 coke ovens and a

double coke oven gas collection main.

3

## STATUTORY AND REGULATORY BACKGROUND

12.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  CAA Section 101(b)(1); 42 U.S.C. § 7401(b)(1).

13.     Section 108(a) of the Act, 42 U.S.C. § 7409(a), requires the Administrator of U.S. EPA to identify and prepare air quality criteria for each air pollutant, emissions of which may endanger public health or welfare, and the presence of which results from numerous or diverse mobile or stationary sources.  For each such "criteria" pollutant, Section 109 of the Act, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards ("NAAQS") requisite to protect the public health and welfare.

14.     Pursuant to Section 109, 42 U.S.C. § 7409, EPA has identified sulfur dioxide, carbon monoxide, lead, nitrogen dioxide, ozone, and particulate matter as criteria pollutants, and has promulgated NAAQS for such pollutants.  40 C.F.R. Part 50.

15.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is termed an "attainment" area with respect to such pollutant.  An area that does not meet the NAAQS for a particular pollutant is termed a "nonattainment" area with respect to that pollutant.

16.     An area that cannot be classified as either "attainment" or "nonattainment" with respect to a particular pollutant due to insufficient data is termed "unclassifiable" with respect to such pollutant.

4

17.    Boyd County, Kentucky, was designated by EPA in 1978 as a non-attainment area for particulate matter, as indicated by Total Suspended Particulates (TSP)  (Vol. 43 Fed. Reg. 8962, March 3, 1978).  Boyd County, Kentucky is currently designated "unclassified" for particulate matter; however,  401 KAR Section 59:010(2) applies regardless of future reclassification.

**Kentucky State Implementation Plan ("SIP")**

18.    Under CAA Section 110, 42 U.S.C. § 7410, each state is required to adopt and submit to U.S. EPA for approval a SIP that provides for the implementation, maintenance and enforcement of NAAQS established under CAA Section 109 within the States.  Upon U.S. EPA's approval, State plan provisions become part of the "applicable implementation plan" for the State within the meaning of CAA Section 302(q), 42 U.S.C. § 7602(q), and are federally enforceable under Section 113(a) of the CAA.

19.    Pursuant to CAA Section 110, 42 U.S.C. § 7410, the Commonwealth of Kentucky adopted and submitted to U.S. EPA various regulations, including 401 KAR 61:140 (Existing By-Product Coke Manufacturing Plants), 401 KAR 59:010 (New Process Operations), 401 KAR 63:010 (Fugitive Emissions), and 401 KAR 50:055 Section 2(5) (General Compliance Requirements) to the U.S. EPA for approval.   EPA approved these provisions into Kentucky's SIP. *See* 40 C.F.R. Part 52, Subpart S.  These regulations are hereafter referred to as the "Kentucky SIP Rules, or the Kentucky SIP"

20.    AK Steel was a major air pollution source which operated in Kentucky and was subject to the Kentucky SIP.  401 KAR 50:035.

5

21.     Battery #3 is subject to 401 KAR 61:140 Section 3(5).  401 KAR 61:140 contains, among other things, opacity limits applicable to pushing operations and combustion stacks, and charging, quenching, batter topside leaks and doors.

22.     401 KAR 61:140 Section 3. Standards for Particulate Matter (1) requires no visible emissions during charging cycle from the control equipment, the charging ports, the lary cars or the open chuck door, except for an average of twenty-five (25) seconds of any visible emissions (excluding water vapor) per charge, averaged over five (5) consecutive charges.

23.     401 KAR 61:140 Section 3. Standards for Particulate Matter (2) requires no more than five (5) percent of the charging ports and ten (10) percent of the standpipes on operating ovens shall be leaking (exhibiting visible emissions except for steam or nonsmoking flame) at any time.

24.     401 KAR 61:140 Section 3. Standards for Particulate Matter (3) requires no visible emissions, except nonsmoking flame, from more than ten (10) percent of the total coke oven doors on a battery.

25.     401 KAR 61:140 Section 3. Standards for Particulate Matter (4) requires no visible emissions (other than water mist or vapor) shall exceed twenty (20) percent opacity from any coke oven combustion stack.

26.     401 KAR 61:140 Section 3. Standards for Particulate Matter (5) requires no visible emissions during pushing, as observed at fifteen (15) second intervals, shall exceed twenty (20) percent opacity from the time the oven door removal has been completed until the hot car is inside the quench tower except for ten (10) percent of the total number of observations recorded.

27.     401 KAR 61:140 Section 3. Standards for Particulate Matter (6) requires no visible emissions during quenching, except water vapor or mist, shall exceed an opacity of twenty (20) percent during the quenching operations; no process water shall be used for quenching and the make-up water shall not contain total dissolved solids concentration in excess of 7mg/liter; and, that the quench tower draft is adequate to ensure that all visible quenching gases exit through the quench tower baffles.

28.     Battery #4 is subject to 401 KAR 59:010.  401 KAR 59:010 contains, among other things, opacity limits applicable to pushing operations and combustion stacks.

29.     401 KAR 59:010 (New Process Operations), Section 3 (Standards for Particulate Matter) (1) (a) requires that no person shall cause, suffer, allow, or permit any continuous emission into the open air from a control device or stack associated with any affected facility which is equal to or greater than twenty (20) percent opacity.

30.     401 KAR 59:010 (New Process Operations), Section 3 (Standard for Particulate Matter) (1)(b) requires that no person shall cause, suffer, allow, or permit any continuous or intermittent fugitive emission into the open air from any affected facility or source located in any area designated non-attainment for total suspended particulates under 401 KAR 51:010 which is equal to or greater than twenty (20) percent opacity, or which remains visible beyond the line of the property on which the emission originates.

31.     401 KAR 63:010 (Fugitive emissions) is applicable to AK Steel's Coke Plant, specifically to an apparatus, operation, or road which emits or may emit fugitive emissions provided that such fugitive emissions from such facility are not elsewhere subject to an opacity

7

standard with the administrative regulations of the Division for Air Quality. (401 KAR 63:010 Section 1.

32.     Fugitive emissions means the emissions of any air contaminant into the open air other than from a stack or air pollution control equipment exhaust.  401 KAR 63:010 Section 2.

33.     During the "pushing" process at AK Steel's Coke Plant, there is the potential to create very large volumes of fugitive emissions which consist of soot and volatile and semi-volatile organic compounds that are classified as hazardous air pollutants pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412, and as Group A carcinogens (known to cause cancer in humans).

34.     Pushing emissions are fugitive emissions.  Both federal and SIP regulations required procedures to quantify the magnitude of such emissions through opacity readings conducted by properly certified individuals to ensure compliance with the opacity limits above. The Part 63 MACT Standards and SIP standards rely on Method 9 or a modified application of Method 9 to evaluate pushes.

35.     401 KAR 63:010 (Fugitive emissions) Section 3 (Standards for Fugitive Emissions) requires that no person shall cause, suffer, or allow any material to be handled, processed, transported, or stored; a building or its appurtenances to be constructed, altered, repaired, or demolished, or a road to be used without taking responsible precaution to prevent particulate matter from becoming airborne.

36.     401 KAR 59:010 (Fugitive emissions) is applicable to AK Steel's Coke Plant.  401 KAR 59:010 Section 3 (Standards for Fugitive Emissions) requires that no person shall cause, suffer, or allow any material to be handled, processed, transported, or stored: a building or its

appurtances to be constructed, altered, repaired, or demolished, or a road to be used without taking responsible precaution to prevent particulate matter from becoming airborne.

37.    401 KAR 50:055 (General Compliance Requirements), is applicable to AK Steel's Coke Plant.

38.    401 KAR 50:055 (General Compliance Requirements) requires that at all times, including periods of start-up, shutdown and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Cabinet which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source.

**Maximum Available Control Technology ("MACT")**

**Part 63, Subpart L**

39.    On October 27, 1993, EPA promulgated the National Emission Standards for Hazardous Air Pollutants for Coke Oven Batteries, at 40 C.F.R. Part 63, Subpart L, §§ 63.300-63.313, (hereinafter Part 63, Subpart L).  58 Fed. Reg. 57,898.

40.    Part 63, Subpart L establishes national emission standards for hazardous air pollutants for all existing coke oven batteries, including by-product coke oven batteries, and all new coke oven batteries constructed on or after December 4, 1992.  (40 C.F.R. § 63.300; 58 Fed. Reg. 57,898, 57899.

9

41.     AK Steel's facility is subject to 40 C.F.R. Part 63 MACT Standards, Subpart A
(General Provisions) and Subpart L, pursuant to the applicability requirements in 40 C.F.R. §
63.300.

42.     Among other things, Part 63, Subpart L establishes limits on the percent of leaking
coke oven doors, topside port lids, offtake systems, as well as limits on visible emissions per
charge.

43.     AK Steel's title V permit, number V-07-036 requires AK Steel to comply with Part
63, Subpart L, and AK Steel is subject to Part 63, Subpart L.

**Part 63, Subpart CCCCC**

44.     On April 14, 2003, EPA promulgated the National Emission Standards for
Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching and Battery Stacks, at 40 C.F.R.
Part 63, Subpart CCCCC, §§ 63.7280-7352 (hereinafter Subpart CCCCC). 68 Fed. Reg. 18008.

45.     Subpart CCCCC establishes national emission standards for hazardous air
pollutants for pushing, soaking, quenching, and battery stacks at coke ovens.  40 C.F.R. §
63.7280.

46.     Subpart CCCCC also establishes requirements to demonstrate initial and
continuous compliance with all applicable emission limitations, work practice standards, and
operation and maintenance requirements.  40 C.F.R. § 63.7280

47.     Subpart CCCCC applies to owners and operators of coke oven batteries at a coke
plant that is (or is part of) a major source of hazardous air pollutant (HAP) emissions.  A major
source of HAP is a plant that emits or has the potential to emit any single HAP at a rate of 10 tons

or more per year or any combination of HAP at a rate of 25 tons or more per year. 40 C.F.R. § 63.7281.

48.     The AK Steel Coke Plant was a major source of HAPs pursuant to Section 112(a) of the Clean Air Act and 40 C.F.R. § 63.2 because it emitted  or had the potential to emit at least 227 tons of HAPs per year.  AK Steel· is subject to 40 C.F.R. 63 Subpart CCCCC.

49.     AK Steel's title V permit  required AK Steel to comply with Subpart CCCCC, and AK Steel is subject to Subpart CCCCC.

**40 C.F.R. Part 61, Subpart V, National Emission Standard for Equipment Leaks**

50.     On June 4, 1984, EPA promulgated the National Emission Standards for Hazardous Air Pollutants for Equipment Leaks, at 40 C.F.R. Part 61, Subpart V, §§ 61.240-61.277 (hereinafter Subpart V), 49 Fed. Reg. 23,513.

51.     Subpart V applies to equipment in benzene service at coke by-product recovery plants and establishes requirements to detect, repair and prevent leaks. 40 C.F.R. §§ 61.130 and 61.135.  AK Steel's Coke Plant contained a coke by-product recovery plant.

52.     AK Steel's title V permit requires AK Steel to comply with Subpart V.

53.     AK Steel is subject to Subpart V.

**40 C.F.R. Part 61, Subpart L, National Emission Standards for Benzene Emissions from Coke-By-Product Recovery Plants**

54.     On September 14, 1989, EPA promulgated the National Emission Standards for Hazardous Air Pollutants for Benzene Emissions at Coke-By-Product Recovery Plants, at 40 C.F.R. Part 61, Subpart L, §§ 61.130-61.139, (hereinafter Part 61, Subpart L).  54 Fed. Reg. 38,044.

11

55. Part 61, Subpart L applies to sources at coke by-product recovery plants such as: finished liquor collectors, tar storage tanks, tar cookers, excess ammonia liquor storage tanks, tar decanters, flushing liquor circulation tanks, wash oil decanters, and wash oil circulation tanks; and establishes requirements to reduce benzene emissions. 40 C.F.R. § 61.130. 54 Fed. Reg. 38,044, 38,047. AK Steel's coke by-product recovery plant contained some or all of these sources.

56. AK Steel's title V permit requires AK Steel to comply with Part 61, Subpart L.

57. AK Steel is subject to Part 61, Subpart L.

**Circumvention, concealing emissions/operation and maintenance**

58. AK Steel is subject to the requirements of 40 C.F.R. § 63.4(b), 40 C.F.R. § 63.6(e) and 401 KAR 50:055 Section 2 (5). Subpart CCCCC, Table 1.

59. 40 C.F.R. § 63.4 (b) prohibits activities that conceal emissions.

60. 40 C.F.R. § 63.6 (e) requires AK Steel to operate and maintain its coke plant in a manner consistent with safety and good air pollution control practices for minimizing emissions.

**Title V Permit**

61. Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), provides that no major source or certain other sources may operate without a Title V permit after the effective date of any permit program approved or promulgated under Title V of the Act.

62. EPA promulgated full approval of Kentucky's operating permit program under Title V of the Act, effective November 30, 2001. (66 Fed. Reg. 54953, Oct. 31, 2001).

63. Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), requires that each Title V permit include enforceable emission limitations and standards, a schedule of compliance, and other

12

conditions necessary to assure compliance with applicable requirements, including those contained in a state implementation plan. 42 U.S.C. § 7661(c(a).

64.    In relevant part, "applicable requirements" include the following, as they apply to a major source: any standard or other requirements provided for in the applicable SIP; any term or condition of any preconstruction permit issued under the Prevention of Significant Deterioration regulations; and any standard or other requirements under Section 112 of the Act, including National Emission Standards for Hazardous Air Pollutants. 40 C.F.R. § 70.2; 401 KAR 52:001.

65.    Major sources and sources subject to National Emission Standards for Hazardous Air Pollutants are required to obtain a Title V operating permit, and to operate in compliance with such permit.  40 C.F.R. § 70.1(b); 401 KAR 52:020.

66.    The AK Steel coke plant was a major source because it emitted or had the potential to emit 10 tons or more per year of a single HAP or 25 tons or more per year of any combination of HAPs. 42 U.S.C. § 7412(a)(1); 401 KAR 52:020.

67.    The AK Steel coke plant was subject to more than one National Emission Standards for Hazardous Air Pollutants.

68.    AK Steel was required to obtain a Title V permit for its coke plant, and to operate in compliance with it.  40 C.F.R. § 70.1(b); 40 KAR 52:020.

69.    AK Steel was issued a Title V operating permit under 401 KAR 52:020, number V-07-036, effective June 16, 2008 through June 16, 2013.

70.    AK Steel's title V permit  requires AK Steel to submit semi-annual reports, certified by a responsible official, clearly identifying all deviations from permit conditions. Permit Number V-07-036, Section F.6, page 70 of 77.

13

71.    AK Steel's title V permit requires AK Steel to certify compliance with terms and conditions of the permit annually.  Permit Number V-07-036, Section F.9, page 71 of 77.

72.    AK Steel's title V permit consolidates and incorporates all terms and conditions from previously issued prevention of significant deterioration permits for AK Steel's coke plant. Permit Number. V-07–36, Section G.1.o, page 73 of 77.

73.    AK Steel's title V permit requires compliance with 40 C.F.R. Part 63, Subpart L, National Emission Standards for Coke Oven Batteries.  Permit Number V-07-036, Section B.

74.    AK Steel's title V permit requires compliance with 40 C.F.R. Part 63, Subpart CCCCC, National Emission Standards for Benzene Emissions from Coke By-Product Recovery Plants.  Permit Number. V-07-036, Section B.

75.    AK Steel's title V permit requires compliance with 40 C.F.R. Part 61, Subpart FF, National Emission Standards for Benzene Waste Operations.  Permit Number V-07-036, Section B.

76.     AK Steel's title V permit requires compliance with 40 C.F.R. Part 61, Subpart L, National Emission Standards for Hazardous Air Pollutants for Benzene Emissions at Coke-By-Product-Recovery Plants.

77.    All terms and conditions of AK Steel's title V permit, except those identified as state-origin requirements, are enforceable by EPA.  42 U.S.C. § 7413(a)(3); Permit Number V-07-036, Section G.1h, page 73 of 77.

**Enforcement Provisions**

78.    Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b)(1) authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil

14

penalty against any person whenever such person has violated, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit.  Section 113(b)(2), 42 U.S.C. § 7413(b)(2) authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty against any person whenever such person has violated, or is violation of, requirements of the Clean Air Act other than those specified in Section 113(b)(1).

79.     Pursuant to CAA Section 113(a) and (b), 42 U.S.C. § 7413(a) and (b), SIP requirements that U.S. EPA has approved are federally enforceable.

80.     Failure to comply with any approved regulatory provision of a SIP renders the person or the governmental entity so failing to comply in violation of a requirement of an applicable implementation plan and subject to enforcement action under CAA Section 113, 42 U.S.C. § 7413.  40 C.F.R. § 52.23.

81.     On numerous occasions, where necessary, EPA and Kentucky issued Notices of Violations ("NOV") to AK Steel, including on July 23, 2007, December 9, 2008, and November 29, 2011, from EPA, and April 8, 2008, July 2, 2008, July 9, 2008, July 29, 2008, August 26, 2008,  September 9, 2008, February 12, 2009, June 16, 2009, July 6, 2009, and eleven separate NOVs from Kentucky in 2010.

82.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

15

FIRST CLAIM FOR RELIEF
NESHAP and Title V Permit Violations

83.     Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

84.     On 26 days in July and August of 2010, the number of Battery #4 standpipes leaking, as observed using Method 303, exceeded 5% of the total standpipes, thus constituting a violation of specific provisions in title V permit number V-07-036, established pursuant to 401 KAR 51:017 (PSD), applicable to emission point/unit number 13.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

85.     On 25 days in July and August 2010, the number of Battery #4 doors leaking, as observed using Method 303, exceeded 10% of the total doors, in violation of specific provisions in title V permit number V-07-036, established pursuant to 401 KAR 51:017, applicable to emission point/unit number 14.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

86.     On 56 days in July and August 2010, the number of Battery #4 standpipes leaking, as observed using Method 303, exceeded 2.5% of the total standpipes over a 30-day rolling average period in violation of 40 C.F.R. § 63.304(b)(2)(iii), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 13.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

87.     On July 12, 2010, the number of Battery #4 oven lids leaking, as observed using Method 303, exceeded 2% of the total lids, in violation of specific provisions in title V permit number V-07-036, established pursuant to 401 KAR 51:017, applicable to emission point/unit

number 13.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

88.     On January 15, 2009, and October 22, 2009, the number of Battery #4 standpipes leaking, as observed using Method 303, exceeded 5% of the total standpipes in violation of specific provisions in title V permit number V-07-036, established pursuant to 401 KAR 51:017, applicable to emission point/unit number 13.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2010.

89.     Beginning in 2008, and continuing at least through December 2010, AK Steel failed to complete a performance test on the Sulfiban-Sulfur Recovery Unit within 180 days of issuance of the title V permit, as required by specific provisions in title V permit number V-07-036, applicable to emission point/unit 19.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2010.

90.     AK Steel failed to maintain a combustion temperature on the Sulfiban-Sulfur Recovery Unit of at least 1300 degrees Fahrenheit from January 3 through January 6, 2009, as well as 12 days in 2008, in violation of 401 KAR 61:035, and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 19.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009 and January 2010.

91.     On January 21, 2008, and May 11, 2008, emissions from the Battery #3 combustion stack exceeded 15% opacity calculated as a daily average for those days, in violation of 40 C.F.R. § 63.7296 of Subpart CCCCC, and specific provisions of permit number V-07-036, applicable to emission point/unit number 9.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

92.     During 2008, there were numerous violations associated with the baghouse attached to the hood used to collect emissions from Battery #3 and Battery #4 pushing operations, as follow in paragraphs 93-97.

93.     On 13 days in 2008, fan amps were less than 728.80, the minimum value established during baghouse compliance testing, in violation of 40 C.F.R. § 63.7290(b)(3)(I) of Subpart CCCCC.

94.     On 6 days, fan amp measurements were missing or not properly recorded, in violation of 40 C.F.R. § 63.7323(c) of Subpart CCCCC.

95.     During 102 days, baghouse pressure drop was out of the range established in the manufacturer's recommendations, in violation of 40 C.F.R. § 63.7330(a)(3) of Subpart CCCCC.

96.     On 3 days AK Steel failed to conduct daily baghouse inspections to check the compressed air supply, in violation of 40 C.F.R. § 63.7330(a)(3) of Subpart CCCCC.

97.     On 3 days AK Steel failed to conduct daily baghouse inspections to monitor cleaning cycles, in violation of 40 C.F.R. § 63.7330(a)(4) of Subpart CCCCC.

98.     The violations identified in the preceding six paragraphs were reported by AK Steel in its title V compliance certification submitted in January 2009, and violated specific provisions in title V permit number V-07-036, applicable to emission points/units 16.

99.     On February, 25, April 26 and May 14, 2008, emissions from Battery #4 combustion stack exceeded 20% opacity as a daily average for those days, in violation of 40 C.F.R. § 63.7296 of Subpart CCCCC, and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 15.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

100.     Pursuant to 40 C.F.R. 63.302(a)(3)(iii), there shall not be more than 0.4% leaking topside port lids (charging ports), as determined by the procedures in 40 C.F.R. 63. 309(d)(1).

101.     On May 20, 2009, an authorized representative of KDAQ conducted a U.S. EPA Method 303 Observation.  During the inspection a total of five (5) of the one hundred eighty-six (186) lids were leaking.  A total of 2.69% of lids were observed to be leaking.

102.     On April 12, 2010, emissions from Battery #4 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 59:0101 Section 3(1)(a), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 15. These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

103.     On April 27, 2010, and July 29, 2010, emissions from the quench tower serving battery #3 exceeded the 20% opacity, in violation of 401 KAR 61:140 Section 3(6)(a), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 11.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

104.     Monthly inspections were completed of the Battery #4 quench tower during each month of 2008.  Each inspection report indicates that repairs to quench tower baffles were needed. Such repairs were not completed during any period of 2008, in violation of 40 C.F.R. § 63.7295(b)(4) of Subpart CCCCC, and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 17.  These violations were reported by AK Steel in its title V permit compliance certification submitted in January 2009.

19

105.   On seven separate occasions in 2010, emissions from Battery #3 pushes exceeded 20% opacity for more than 10% of the total observations, in violation of 401 KAR 61:140 .Section 3(5)(a), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 10.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

106.   On nine separate occasions in 2010, emissions from the Battery #3 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 61:140 Section 3(4), and specific provisions in title V permit number V-07-036, applicable to emission point/unit 09.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

107.   On July 1, July 2, July 6, July 7 and July 24, 2010, Battery #3 charges exceeded the maximum average charge emission duration times for the charges observed on those days using Method 303.   These exceedances are each a violation of 401 KAR 61:140 Section 3(1), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 06.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

108.   On July 1, July 2 and July 6, 2010, the number of Battery #3 standpipes leaking, as observed using method 303, exceeded 10% of the total standpipes, in violation of 401 KAR 61:140 Section 3(2), and specific provisions  in title V permit number V-07-036, applicable to emission point/unit number 07.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

109.    On nine separate occasions in 2010, emissions from the Battery #3 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 61:140 Section 3(4), and specific provisions in title V permit number V-07-036, applicable to emission point/unit 09. These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

110.    On 19 days in July of 2010, the number of Battery #3 doors leaking, as observed using Method 303, exceeded 10% of the total doors, in violation of 401 KAR 61:140 Section 3(3), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 08.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

111.    On May 20, 2009, Battery #3 charges exceeded maximum average emission duration times for the charges observed by KDAQ using Method 303, in violation of 401 KAR 61:140 Section 3(1), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 06.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2010.

112.    On at least one day during 2009, emissions from the quench tower serving Battery #3 exceeded opacity, in violation of 401 KAR 61:140 Section (6)(a), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 11.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

113.    On 19 days in July of 2010, the number of Battery #3 doors leaking, as observed using Method 303, exceeded 10% of the total doors, in violation of 401 KAR 61:140 Section 3(3), and specific provisions in title V permit number V-07-036, applicable to emission point/unit

21

number 08.   These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

114.    On May 20, 2009, Battery #3 charges exceeded maximum average emission duration times for the charges observed by KDAQ using Method 303, in violation of 401 KAR 61:140 Section 3(1), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 06.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2010.

115.    On four separate occasions in June and July 2008, emissions from the Battery #3 combustion stack exceeded 20% opacity as measured using Method 9, in violation of 401 KAR 61:140 Section 3(4), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 09.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

116.    During the week of June 21, 2010, EPA documented 21 instances where equipment in benzene service had not been marked, in violation of 40 C.F.R. § 61.135(c) and (a), Part 61, Subpart L, and specific provisions in title V permit number V-07-036, applicable to in-benzene-service equipment in the furnace coke byproducts recovery area.

117.    During the week of June 21, 2010, EPA documented 7 instances where plugs were missing in the light oil recovery area and 2 instances where plugs were missing in the nitrogen blanketing system in violation of 40 C.F.R. § 61.242-6(a)(1), Part 61, Subparts L and V, and specific provisions in title V permit number V-07-036, applicable to in-benzene-service equipment in the furnace coke byproducts recovery area.

118.    During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that AK Steel operated a finished liquor collector that was uncontrolled and vented to the atmosphere from March 17, 2009 to July 9, 2010, in violation of 40 C.F.R. § 61.132(a)(1), and specific provisions in title V permit number V-07-036, applicable to process vessels in the furnace coke byproducts area.

119.    During the week of June 21, 2010,  based on information gathered as part of EPA's inspection, EPA found that the sampling systems located on each of the two light oil storage tanks were not equipped with a closed-purge, closed-loop, or closed vent system, in violation of 40 C.F.R. 61,242-5(a), and specific provisions in title V permit number V-07-036, applicable to process vessels in the furnace coke byproducts area.

120.    During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that AK Steel maintains a "Difficult to Access" annual monitoring list.  There are 67 valves on the list that are required to be monitored quarterly, but beginning in 2008 through at least June of 2010, they were only monitored annually, in violation of 40 C.F.R. § 61.242-7(h), and specific provisions in title V permit number V-07-036, applicable to process vessels in the furnace coke byproducts area.

121.    During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that the semiannual report for January 2010, through June 2010 includes a visual weekly pump inspection form that shows that the light oil decanter still pump (tag ID 10.5) was leaking on April 1, 2010.  There was no record of repair attempt dates, the dates repairs were completed, or indication that repairs would be delayed, in violation of 40 C.F.R. §

61.246(c), and specific provisions in title V permit number V-07-036, applicable to process vessels in the furnace coke byproducts area.

122.     During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that there were approximately 407 components on the tar storage tanks, tar cookers (tar dewatering tanks), excess ammonia liquor storage tanks, tar decanters, flushing liquor circulation tanks, wash oil decanter, and wash oil circulation tanks that were not monitored during the second semiannual monitoring period in 2009 (July 1 through December 31, 2009), and the first semiannual monitoring period in 2010 (January 1 through June 30, 2010), in violation of 40 C.F.R. § 61.132(b), and specific provisions in title V permit number V-07-036, applicable to process vessels in the furnace coke byproducts area.  These components were delisted as "in-benzene-service equipment," but were still required to be monitored on a semi-annual basis as part of the closed vent control system.

123.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 4, 2004.

SECOND CLAIM FOR RELIEF
CAA/Kentucky SIP and Title V Violations
Battery #4

124.     Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

125.     Battery #4 contains 70 coke ovens, each of which is pushed approximately every twenty-two (22) hours.

24

126 .     For Battery # 4 Pushing, AK Steel violated 401 KAR 59:010 Section 3(1)(b), which establishes an "intermittent" fugitive opacity limit of 20% averaged from twelve (12) consecutive 15-second readings.

127.      During a June 12-14, 2007 on-site inspection, EPA evaluated visible emissions from eight separate Battery #4 pushes. Five of the eight pushes observed by EPA clearly exceeded the limit established in 401 KAR 59:010 Section 3(1)(b).

128.      While inspecting the AK Steel Plant on October 7-10, 2008, EPA observed that five (5) of a total of eighteen (18) pushes at Battery #4 violated 401 KAR 59:010 Section 3(1)(b).

129.      Plaintiffs allege that AK Steel improperly read the opacity at Battery #4 in a manner that seriously underestimates the visible emissions, AK Steel's own readings show that Battery #4 pushes exceeded the opacity limits on 28 occasions from March 29, 2007 through June 20, 2007.

130.      On February 25, April 26 and May 14 of 2008, emissions from Battery #4 combustion stack exceeded the 20% opacity calculated as a daily average for those days, in violation of 40 C.F.R. § 63.7296, and specific provisions in title V permit number V-07-036. These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

131.      On April 12, 2010, emissions from Battery #4 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 59:0101 Section 3(1)(a). These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

132.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

THIRD CLAIM FOR RELIEF
CAA/Kentucky SIP and Title V Violations
401 KAR 61:140 Section 3
Battery #3

133.    Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

134.    401 KAR 61:140 Section 3(5) provides that during coke oven pushing no visible emissions, as observed at fifteen (15) second intervals, shall exceed twenty (20) percent opacity from the time the oven door removal has been completed until the hot car is inside the quench tower except for ten (10) percent of the total number of observations recorded.  Section 3(3) prohibits visible emissions (other than nonsmoking flame) from more than ten (10) percent of the total coke oven doors on a battery.

135.    Battery #3 contains 76 coke ovens, each of which was pushed approximately every nineteen (19) hours.

136.    For Battery #3, AK Steel violated 401 KAR 61:140 Section 3(3) and (5) which establish emission levels for existing by-product coke manufacturing plants.

137.    On July 20, 2007, the opacity for three (3) out of four recorded (4) pushes exceeded the limit found in 401 KAR 61:140, because more than one in ten fifteen (15) second reading exceeded 20% opacity.

138.     From October 7-10, 2008, EPA observed a total of twenty-seven (27) pushes from Battery #3, and eight (8) of those pushes violated the limit in KAR 61:140.

139.     From January 1, 2007 through July 31, 2007, AK Steel conducted 557 visible emission readings of pushes that EPA considered valid out of 849 total tests.  Of the 557 valid readings, approximately 25% exceeded the limit in the Kentucky SIP.

140.     During an inspection from October 7-10, 2008, EPA documented over ten (10) percent of Battery #3 doors were leaking in violation of 401 KAR 61:140 Section 3 (3).

141.     On May 20, 2009, an authorized representative of KDAQ conducted a Method 303 Observation and observed visible emissions from 14 doors on the Push Side and 18 doors on the Coke Side.  The Method 303 Observation revealed that a total of 20.8% of Battery #3 doors were leaking in violation of 401 KAR 61:140 Section 3(3).

142.     Pursuant to 401 KAR 61:140 Section 3 (1), there can be no visible emissions during the charging cycle from the control equipment, the charging ports, the larry cars or the open chuck door, except for an average of twenty-five (25) seconds of any visible emissions (excluding water vapor) per charge, averaged over five (5) seconds.

143.     On April 30, 2008, an authorized representative of KDAQ observed four (4) consecutive charges for Battery #3 which totaled seven (7) minutes and five (5) seconds.  The limit established in 401 KAR 61.140 Section 3 (1) was exceeded within four (4) consecutive charges.

144.      On April 30, 2008, an authorized representative of KDAQ observed quenching emissions from Battery #3 from oven #45 at 80% in violation of 401 KAR 61:140 Section 3 (6).

145.     On April 30, 2008, an authorized representative of KDAQ observed fifteen (15)

leaking doors on the push side of Battery #3, Seven (7) ovens were inoperable during the observation. According to AK Steel's permit and 401 KAR 61:140 Section 3 (3), no more than 10% of the total operable oven doors may leak. The allowable limit during this observation was fourteen (14) leaking doors.

146.   On May 20, 2009, an authorized representative of KDAQ conducted a Method 303 Observation and observed visible charging emissions of 0.57 second, 13.16 seconds, 119.83 seconds, 25.55 seconds and 3.47 seconds for Battery #3. The arithmetic mean of the observations was 32.516 seconds of visible emissions per charge in violation of 401 KAR 61:140 Section 3 (1).

147.   On April 27, 2010, and July 29, 2010, emissions from the quench tower serving battery #3 exceeded the 20% opacity, in violation of 401 KAR 61:140 Section 3(6)(a). These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

148.   On seven separate occasions in 2010, emissions from Battery #3 pushes exceeded 20% opacity for more than 10% of the total observations, in violation of 401 KAR 61:140 .Section 3(5)(a). These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

149.   On nine separate occasions in 2010, emissions from the Battery #3 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 61:140 Section 3(4). These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

150.   On July 1, July 2, July 6, July 7 and July 24, 2010, Battery #3 charges exceeded the maximum average charge emission duration times for the charges observed on those days

using Method 303.  These exceedances are each a violation of 401 KAR 61:140 Section 3(1).

These violations were reported by AK Steel in its title V compliance certification submitted in

January 2011.

151.    On July 1, July 2 and July 6, 2010, the number of Battery #3 standpipes leaking,

as observed using method 303, exceeded 10% of the total standpipes, in violation of 401 KAR

61:140 Section 3(2).  These violations were reported by AK Steel in its title V compliance

certification submitted in January 2011.

152.    On 19 days in July of 2010, the number of Battery #3 doors leaking, as observed

using Method 303, exceeded 10% of the total doors, in violation of 401 KAR 61:140 Section 3(3).

These violations were reported by AK Steel in its title V compliance certification submitted in

January 2011.

153.    On 49 days in July and August of 2010, the number of Battery #3 doors leaking,

as observed using Method 303, exceeded 3.3% of the total doors over a 30-day rolling average

period, in violation of 40 C.F.R. § 63.303(a)(3)(ii).  These violations were reported by AK Steel in

its title V compliance certification submitted in January 2011.

154.    On May 20, 2009, Battery #3 charges exceeded maximum average emission

duration times for the charges observed by KDAQ using Method 303, in violation of 401 KAR

61:140 Section 3(1).  These violations were reported by AK Steel in its title V compliance

certification submitted in January 2010.

155.    On at least one day during 2009, emissions from the quench tower serving Battery

#3 exceeded opacity, in violation of 401 KAR 61:140 Section (6)(a).  These violations were

reported by AK Steel in its title V compliance certification submitted in January 2009.

156.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

FOURTH CLAIM FOR RELIEF
CAA MACT Violations of Subpart CCCCC

157.     Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

158.     Subpart CCCCC requires observation and recording of fugitive emission opacity emitted during pushing from each oven at least once every ninety (90) days.   These readings are required to be taken in accordance with Method 9 pursuant to 40 C.F.R. §§ 63.7291 and 63.7334.

159.     EPA and KDAQ inspectors observed AK Steel's Method 9 readers conducting the opacity readings while looking into the general direction of the sun, in violation of the requirements of Method 9, which requires that the observers read emissions with the sun oriented in the 140 degree sector to his back.

160.     Subsequent to the inspection, EPA collected reading sheets for 850 Battery #3 Method 9 readings conducted by AK Steel or its contractor.  A total of 293 of the readings were done incorrectly and therefore in violation of Subpart CCCCC.  An additional 48 readings were conducted before sunrise, also in violation of Subpart CCCCC.

161.     EPA and KDAQ inspectors further observed that AK Steel's Method 9 readers were significantly underestimating visible emissions, indicating that AK Steel's visible emissions data are biased low.

162.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

FIFTH CLAIM FOR RELIEF
CAA MACT Violations of Subart CCCCC
Battery #3 and #4 Combustion Stacks

163.    Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

164.    For Battery #s 3 and 4, 40 C.F.R. § 63.7333 requires that AK Steel maintain, as monitored by Continuous Opacity Monitoring Systems (COMS), a daily average opacity at or below 15% for a battery on a normal coking cycle or 20% for a battery on battery-wide extended coking.

166.    During 2006-2007, the 24 hour average opacity exceeded the 20% limit at least thirty-six (36) days for Battery #4, and at least twenty-five (25) days for Battery #3.

167.    On April 26, 2008, AK Steel reported a daily opacity of 24.8% for the Battery #4 Stack.

168.    On May 14, 2008, AK Steel reported a daily opacity of 24.8% for the Battery #4 Stack.  Pursuant to 40 C.F.R. 63, Subpart CCCCC, the emission limitation is 20%.

169.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

SIXTH CLAIM FOR RELIEF
CAA MACT Violations of 40 C.F.R. PART 61, SUBPART L

170.    Paragraphs 1-82 above are re-alleged as if fully set forth herein.

171.    During the week of June 21, 2010, EPA documented 21 instances where equipment in benzene service had not been marked, in violation of 40 C.F.R. § 61.135(c) and 40 C.F.R. § 61.135(a) of Part 61, Subpart L, and specific provisions in title V permit number V-07-036, applicable to such equipment in the furnace coke-by-products recovery area.

172.    Based on information initially uncovered during EPA's inspection the week of June 21, 2010, AK Steel operated a finished liquor collector that was uncontrolled and vented to the atmosphere from March 17, 2009 to July 9, 2010, in violation of 40 C.F.R. § 61.132(a)(1) of Part 61, Subpart L, and specific provisions in title V permit number V-07-036 applicable to process vessels in the furnace coke by-products recovery area.  The finished liquor collector receives the overflow from the primary liquor loop.

173.    Based on information gathered during EPA's inspection the week of June 21, 2010, AK Steel had approximately 407 components in the furnace coke by-products recovery area - on the tar storage tanks, tar cookers (tar dewatering tanks), excess ammonia liquor storage tanks, tar decanters, flushing liquor circulation tanks, wash oil decanter, and wash oil circulation tanks–that were not monitored during the second semiannual monitoring period in 2009 (July 1 through December 31, 2009), or the first semiannual monitoring period in 2010 (January 1 through June 20, 2010), in violation of 40 C.F.R. § 61.132(b) of Part 61, Subpart L, and specific provisions the title V permit number V-07-036, applicable to such equipment.  These conditions

were delisted as "in-benzene service equipment," but were still required to be monitored on a semiannual basis as part of the closed vent control system.

174.     Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

SEVENTH CLAIM FOR RELIEF
CAA MACT Violations of 40 C.F.R. Part 61, Subpart V

175.     Paragraphs 1-82 above are re-alleged as if fully set forth herein.

176.     During EPA's inspection the week of June 21, 2010, EPA documented seven instances where plugs in the furnace coke by-products recovery area were missing in the light oil recovery area and two instances where plugs were missing in the nitrogen blanketing system in violation of 40 C.F.R. C§ 61.242-6(a)(1) of Subpart V, and specific provisions in title V permit number V-07-036, applicable to such equipment.

177.     EPA's inspection the week of June 21, 2010 uncovered that the sampling systems located on each of the two light oil storage tanks in the furnace coke by-products recovery area were not equipped with a closed-purge, closed loop, or closed vent system, in violation of 40 C.F.R. § 61.242-5(a) of Subpart V, and specific provisions in title V permit number V-07-036, applicable to such equipment.

178.     Based on information gathered as part of EPA's inspection during the week of June 21, 2010, AK Steel's semiannual report for January 2010, through June 2010, includes a visual weekly pump inspection form that shows that the light oil decanter still pump (tag ID 10.5)

33

in the furnace coke by-product recovery area was leaking on April 1, 2010. AK Steel failed to record repair attempts, the date repairs were completed, or indicate that the repairs would be delayed. Failure to record and/or maintain such records violates 40 C.F.R. § 61.246(c) of Subpart V, and specific provisions in title V permit number V-07-036, applicable to such equipment.

179.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

EIGHTH CLAIM FOR RELIEF
Kentucky SIP and Title V Violations
Battery #3 Combustion Stack

180.    Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

181.    Under 401 KAR 61:140 Section 3(4), the Battery #3 combustion stack visible emissions are limited to less than 20% opacity. Violations of stack emissions can be determined by using Method 9 or from COMS data.

182.    AK Steel provided hourly average COMS data for the stack from January through July 2007. During this period, 163 hourly averages exceeded the 20% opacity.

183.    Using COMS data, AK Steel reported that from April 14, 2006 through June 30, 2006, the Battery #3 stack exceeded the 6-minute opacity limit of twenty (20%) for 30.678% of the time. This equates to 5,855 6-minute periods that Battery #3 was out of compliance.

184.    Based on statistical analysis, EPA has determined that the Battery #3 combustion stack is regularly out of compliance with the 6-minute opacity limit of 20% for tens of thousands of six minute periods per year.

34

185.     On April 15, 2008, an authorized representative of KDAQ performed a Method 9 reading for Battery #3.  Two Method 9 sessions were taken starting at 9:42:30 and ending at 9:54:45.  The first session had an average opacity reading of 23.13%.  The second session had an average opacity reading of 20.21%.

186.     Based on AK Steel's Semi-Annual Deviation Report, an hourly COM reading above 20% was reported.  A Method 9 reading was taken by the facility for Battery #3.  A Method 9 reading of 24.8% was observed by AK Steel on June 30, 2008.

187.     On July 13, 2008, an authorized KDAQ representative conducted an opacity reading pursuant to Method 9 procedures.  Method 9 readings of 42.9 % opacity were observed from Battery #3.

188.     On nine separate occasions in 2010, emissions from the Battery #3 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 61:140 Section 3 (4).  These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

190.     On January 21, 2008, and May 11, 2008, emissions from Battery #3 combustion stack exceeded 15% opacity calculated as a daily average for those days, in violation of 40 C.F.R. § 63.7296.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

191.     On four separate occasions in June and July 2008, emissions from the Battery #3 combustion stack exceeded 20% opacity as measured using Method 9, in violation of 401 KAR 61:140 Section 3(4).  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

35

192.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

NINTH CLAIM FOR RELIEF
Kentucky SIP and Title V Violations
Battery #4 Combustion Stack

193.    Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

194.    Under 401 KAR 50:010 Section 3(1)(a), visible emissions from the Battery #4 combustion stack are limited 20% opacity in 6-minute averages.  Opacity is measured in accordance with Reference Method 9.  COMS data can also be used to determine compliance of stack emissions, and AK Steel provided COMS data, at times reporting emissions based on one minute readings, six minute readings and hourly readings.

195.    During the June 2007 inspection, a KDAQ inspector observed emissions from the Battery #4 combustion stack in excess of 20% opacity over a 6-minute period.  In addition, AK Steel provided hourly COMS data for the stack from January through July 2007.  During this period, 813 hourly averages exceeded 20% opacity.

196.    For Battery #4, AK Steel evaluated 6-minute COMS data as part of the first quarterly compliance report required by the MACT (2nd quarter - 2006).  During this period, AK Steel reported that from April 14, 2006, through June 30, 2006, Battery #4 stack opacity exceeded the 20% limit 20% of the time.  This equates to 3,800 6-minute periods of excess emissions within that one quarter.

36

197.    Based on statistical analysis, EPA has determined that the Battery # 4 combustion stack is regularly out of compliance with the 6-minute opacity limit of 20% for tens of thousands of six minute periods per year.

198.    During one seven (7) day period in 2007, emissions from Battery #4 combustion stack exceeded 20% opacity for 587 six-minute periods, or 33.58% of the operating time.  Based on data from other coke oven batteries, a well maintained coke oven battery can be expected to exceed a six-minute combustion stack opacity of 20% only 1% of the operating time.  Each exceedance of the six-minute average of 20% opacity for Battery #4 is a violation of 401 KAR 59:010, Section 3 (1)(a).

199.    Based on AK Steel's Semi-Annual Deviation Report, two hourly COM readings above 20% were reported on June 30, 2008.  The facility reported observed Method 9 readings of 25% and 30.6% for Battery #4.

200.    On  two occasions during June 30, 2008 and on one  occasion on July 21, 2008, emissions from the Battery #4 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 59:010 Section 3(1)(a), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 15.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

201.    On January 15, 2009 and October 22, 2009, the number of Battery #4 standpipes leaking,  applicable to emission point/unit number 13. as observed using Method 303, exceeded 5% of the total standpipes in violation of 401 KAR 51:017,.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2010.

202.   On January 15, 2009, emissions from Battery #4 combustion stack exceeded 20% opacity as measured by Method 9, in violation of 401 KAR 59:010 Section 3(1)(a), and specific provisions in title V permit number V-07-036, applicable to emission point/unit number 15.  This violation was reported by AK Steel in its title V compliance certification submitted in January 2010.

203.   On 26 days in July and August 2010, the number of Battery #4 standpipes leaking, as observed using Method 303, exceeded 5% of the total standpipes, applicable to emission point/unit number 13 in violation of 401 KAR 51:017 (PSD),.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2011.

204.   Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

TENTH CLAIM FOR RELIEF
CAA/Kentucky SIP Violations
Fugitive Emission Violations

205.   Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

206.   401 KAR 63:010 Section 3(2) requires that reasonable precautions be taken to prevent fugitive particulate emissions from becoming airborne and prohibits the discharge of fugitive emissions beyond the property line of the facility.

207.   401 KAR 59:010 Section 3(1)(b) prohibits continuous or intermittent fugitive emissions from a new process operation, such as Battery #4, that equal or exceed 20% opacity or which remain visible (at any opacity level) beyond the lot line of the property.

38

208.    During the June 13 and 14, 2007 inspection, EPA and KDAQ inspectors observed significant levels of fugitive emissions being generated at the AK Coke Plant and leaving the plant property on four separate occasions.   These emissions included fugitive emissions from the operation of both coke oven batteries and emissions from other activities in the coal storage area, and other parts of the AK Coke Plant.  In addition, KDAQ has documented fugitive emissions leaving the property boundary of the Plant on numerous occasions in 2007.

209.    On April 15, 2008, an authorized representative of KDAQ observed fugitive emissions from Battery #4 crossing AK Steel's property line.

210.    On April 30, 2008, May 2, 2008, May 6, 2008, June 25, 2008, and July 13, 2008, an authorized representative of KDAQ observed emissions crossing AK Steel's property line.

211.    During an investigation from October 7-10, 2008, EPA and KDAQ observed several periods during which fugitive emissions from process operations were crossing the property boundary to the west of the facility.  On two (2) separate days, EPA observed that particulate matter from AK Steel's Coke Plant had settled on flat surfaces on the west side of Hwy. 23, and vehicles were coated with black dust.

212.    On June 16, 2009, emissions from an open flue cap from Battery #4 were observed crossing AK Steel's property line by KDAQ and U.S. EPA inspectors.

213.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to $27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

ELEVENTH CLAIM FOR RELIEF
CAA MACT Violations of Subpart CCCCC and Title V Violations
Baghouse Violations

214.    Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

215.    EPA  issued an NOV to AK Steel on November 29, 2011, citing violations of regulations respecting AK Steel's baghouse.

216.    During 2008 there were numerous violations associated with the baghouse attached to the hood used to collect emissions from Battery #3 and Battery #4 pushing operations, including the following:

a.    During 13 days, fan amps were less than 728.89, the minimum value established during baghouse compliance testing, in violation of 40 C.F.R. § 63.7290(b)(3)(i).

b.    On six days, fan amp measurements were missing or not properly recorded, in violation of 40 C.F.R. § 63.7323(c)

c.    During 102 days, baghouse pressure drop was out of the range established in the manufacturer's recommendations, in violation of 40 C.F.R. § 63.7330(a)(3).

d.    On 3 days AK Steel failed to conduct daily baghouse inspections to monitor cleaning cycles, in violation of 40 C.F.R. § 63.7330(a)(4).

217.    Each violation listed in this Eighth Claim for Relief is also a violation of specific provisions in title V permit number V-07-036, applicable to emission points/unit numbers 10 and 16.  These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

218.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to

40

$27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

### TWELFTH CLAIM FOR RELIEF
CAA/Kentucky SIP, MACT and Title V Violations
Improper Operation and Maintenance

219.     Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

220.     401 KAR 50:055 Section 2 (Compliance with Standards and Maintenance Requirements)(5) provides that at all times, including periods of start-up, shutdown and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.   Determination of whether acceptable operating and maintenance procedures are being used will be based on information available which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source.

221.     40 C.F.R. § 63.6 sets forth operation and maintenance requirements which apply to the owner or operator of affected sources for which any relevant standard has been established pursuant to Section 112 of the CAA.

222.     Proper maintenance of coke ovens and associated equipment is essential to avoid excess emissions from equipment including: coke oven doors, lids, standpipes and stacks. Equipment maintenance is also essential to prevent excess emissions from activities conducted for each oven in use on a daily basis such as charging, pushing, quenching and soaking.

223.     AK Steel has not maintained its coke ovens in a condition that would minimize emissions as required by both the MACT and the Kentucky SIP.

41

224.    AK Steel has provided a large amount of oven assessment data including cross wall temperature readings, condition assessments and recent maintenance activities. According to this information, many ovens are in poor condition. These ovens likely generate more fugitive emissions because they do not work properly and should be repaired. Operating these ovens in this condition is not consistent with the requirement to operate to minimize emissions. AK Steel is in violation of 40 C.F.R. § 63.6 and 401 KAR 50:055 Section 2(5).

225.    On February 3, 2009, the facility reported seventy-nine 79 days in which the PEC Bag House Compartment differential pressure was not operated within the manufacturers recommended operating range; five (5) days without monitoring PEC Bag House Fan Amps; and thirteen (13) days in which the Fan Amps were operated below the permitted limit.

226.    Monthly inspections were completed of the Battery #4 quench tower during each month of 2008. Each inspection report indicates that repairs to quench tower baffles were needed. Such repairs were not completed during any period in 2008, in violation of 40 C.F.R. § 63.7295(b)(4), and Subpart CCCCC. These violations were reported by AK Steel in its title V compliance certification submitted in January 2009.

227.    During the week of June 21, 2010, EPA documented 21 instances where equipment in benzene service had not been marked, in violation of 40 C.F.R. § 61.135(c) and (a), and Part 61, Subpart L, Benzene Emissions from Coke-By-Product Recovery.

228.    During the week of June 21, 2010, EPA documented 7 instances where plugs were missing in the light oil recovery area and 2 instances where plugs were missing in the nitrogen blanketing system in violation of 40 C.F.R. § 61.242-6(a)(1), and Part 61, Subpart V with respect

42

to leak detection and repair, and Part 61, Subpart L, Benzene Emissions from Coke-By-Product Recovery, 40 C.F.R. § 61.135(a).

229.    During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that AK Steel operated a finished liquor collector that was uncontrolled and vented to the atmosphere from March 17, 2009 to July 9, 2010, in violation of 40 C.F.R. § 61.132(a)(1), and Part 61, Subpart L, Benzene Emissions from Coke-By-Product Recovery.

230.    During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that the sampling systems located on each of the two light oil storage tanks were not equipped with a closed-purge, closed-loop, or closed vent system, in violation of 40 C.F.R. 61,242-5(a), and Part 61, Subpart V with respect to leak detection and repair, and Part 61 Subpart L, Benzene Emissions from Coke-By-Product Recovery, 40 C.F.R. § 61.135(a).

231.    During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that AK Steel maintains a "Difficult to Access" annual monitoring list. There are 67 valves on the list that are required to be monitored quarterly, but beginning in 2008 through at least June of 2010, they were only monitored annually, in violation of 40 C.F.R. § 61.242-7(h), and Part 61, Subpart V with respect to leak detection and repair, and Part 61 Subpart L, Benzene Emissions from Coke-By-Product Recovery, 40 C.F.R. § 61.135(a).

.    232.    During the week of June 21, 2010, based on information gathered as part of EPA's inspection, EPA found that the semiannual report for January 2010, through June 2010 includes a visual weekly pump inspection form that shows that the light oil decanter still pump (tag ID 10.5) was leaking on April 1, 2010. There was no record of repair attempt dates, the dates repairs were

completed, or indication that repairs would be delayed, in violation of 40 C.F.R. § 61.246(c), and

Part 61, Subpart V with respect to leak detection and repair, and Part 61 Subpart L, Benzene

Emissions from Coke-By-Product Recovery, 40 C.F.R. § 61.135(a).

233.    During the week of June 21, 2010, based on information gathered as part of EPA's

inspection, EPA found that there were approximately 407 components on the tar storage tanks, tar

cookers (tar dewatering tanks), excess ammonia liquor storage tanks, tar decanters, flushing liquor

circulation tanks, wash oil decanter, and wash oil circulation tanks that were not monitored during

the second semiannual monitoring period in 2009 (July 1 through December 31, 2009), and the

first semiannual monitoring period in 2010 (January 1 through June 30, 2010), in violation of 40

C.F.R. § 61.132(b), and Part 61, Subpart L, Benzene Emissions from Coke-By-Product Recovery.

These components were delisted as "in-benzene-service equipment," but were still required to be

monitored on a semi-annual basis as part of the closed vent control system.

234.    AK Steel violated the CAA and the implementing regulations found at 40 C.F.R. §

63.4(b) by concealing emissions that otherwise would have violated the applicable opacity

standard.  AK Steel operated with open flue caps until the facility ceased operations in July 2011,

despite having been notified in EPA's December 9, 2008 Notice of Violation that operation with

open flue caps violated the regulatory requirements.

235.    AK Steel continued to operate with open flue caps and thus continued to operate

in violation of 40 C.F.R. § 63.6(e), and 401 KAR 50:055 Section 2 (5).

236.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), for each violation referred

to in the preceding paragraphs, AK Steel is subject to injunctive relief and civil penalties of up to

$27,500 per day for each violation occurring on or after January 31, 1997, and $32,500 per day for each such violation occurring on or after March 15, 2004.

THIRTEENTH CLAIM FOR RELIEF<br>401 KAR 53:010, APPENDIX A

237.     Paragraphs 1 through 82 above are re-alleged as if fully set forth herein.

238.     401 KAR 53:010, Appendix A provides that at any time when one (1) volume unit of ambient air is mixed with seven (7) volume units of odorless air, the mixture must have no detectable odor.

239.     On or about July 31, 2007, a detectable odor at 7:1 was observed by a KDAQ inspector in the park across U.S. 23 to the west of AK Steel's Coke Plant and in the parking lot of a business south of the AK Steel Coke Plant.

240.     Pursuant to KRS 224.99-010, for each violation referred to in the preceding paragraph, AK Steel is subject to injunctive relief and civil penalties of up to twenty-five thousand dollars ($25,000) for each day during which such violation continues.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, the United States of America, and the Commonwealth of Kentucky, respectfully request that this Court:

A.     Permanently enjoin Defendant from further violations of the CAA and applicable requirements established thereunder, including provisions of the Kentucky SIP described above;

B.     Require Defendant to relinquish its CAA permit;

C.     Assess civil penalties against Defendant for violations of applicable provisions of the CAA as well as their implementing regulations and permits issued thereunder of up to $27,500

45

per day for each violation occurring on or after January 31, 1997, and $32.500 per day for each

such violation occurring on or after March 15, 2004;

D.     Assess civil penalties against the Defendant for violations of applicable provisions

of Kentucky Administrative Regulations of up to twenty-five thousand dollars ($25,000) per day

for each violation;

E.     Award Plaintiffs their costs and disbursements for this action; and

F.     Grant Plaintiff such other relief, including any mitigation of harm caused by the

Defendant's violations, as the Court may deem just and proper.

Respectfully submitted,

/s/ Robert G. Dreher
ROBERT G. DREHER
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

/s/ William A. Weinischke
WILLIAM A. WEINISCHKE
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C.  20044-7611
Telephone:  202-514-4592
Bill.Weinischke@usdoj.gov

KERRY B. HARVEY
United States Attorney
260 West Vine Street, Suite 300
Lexington, Kentucky 40507-1671
(859) 233-2661

/s/ Robin Gwinn
ROBIN GWINN
Assistant United States Attorney

FOR PLAINTIFF UNITED STATES OF AMERICA

s/ V. ANNE HEARD
Acting Regional Counsel and Director
Office of Environmental Accountability
U.S. Environmental Protection Agency, Region 4

OF COUNSEL
VALERIE NOWELL
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia 30303

COMMONWEALTH OF KENTUCKY


<u>s/ JACQUELYN A. QUARLES</u>
Office of General Counsel
Energy and Environmental Cabinet
200 Fair Oaks Lane, 1st Floor
Frankfort, Kentucky 40601
(502) 564-3999 Ext. 4553